IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

        Plaintiff,

     v.

DANTE IVAN LOZANO,

        Petitioner.

Criminal No. 15-0228
ELECTRONICALLY FILED

**MEMORANDUM OPINION**

In this criminal action, Petitioner, Dante Lozano ("Lozano"), who pled guilty (without a plea agreement) to two counts of a two-count indictment and was sentenced on June 22, 2017 to a term of 210 months (a <u>below</u> guideline range sentence), filed a *pro se* Motion to Vacate, Set Aside, or Correct a Sentence pursuant to 28 U.S.C. § 2255.  Lozano set forth seven bases to support his Section 2255 Petition arguing as follows:

(1) Lozano was essentially "lured" into not taking his case to trial, accepting a plea offer, and on the day the sentencing hearing "the offer was changed" resulting in a higher guideline range.

(2) The Court miscalculated the guideline range when it included a four-level enhancement for a leadership role, when co-conspirators' interviews and court proceedings demonstrate that Lozano was not the organizer/leader.

(3)  The United States probation officer erroneously included a four-level enhancement to Lozano's sentencing guideline offense level based solely upon his "belief" and not "facts" that Lozano was an organizer/leader.

(4)  The District Court erred in imposing the four-level enhancement during sentencing, creating a sentence disparity among Lozano and his seven other co-defendants.

(5) Undue bias, prejudice, and influence, as well as "not being within the Probation Officer's jurisdiction," influenced the District Court to implement the enhancement and increase Lozano's imprisonment guideline range with no evidence to support this enhancement.

(6) Lozano's sentence was unreasonable "per the Sixth Amendment based on the preponderance of evidence."

(7) Lozano also claims ineffective assistance of counsel.

## I.    Factual and Procedural Background

### A. Summary

On October 27, 2015, Lozano and his co-defendants were indicted by a federal grand jury sitting in the Western District of Pennsylvania.  ECF 3.  The Indictment charged him with two offenses: Count one charged Lozano with conspiracy to distribute and possession with intent to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine; and Count two charged him with conspiracy to launder monetary instruments.  Id.  In addition to Lozano, seven other individuals were charged with one or both of the crimes set forth in the indictment. Id.

Lozano, who was imprisoned in Texas, made his initial appearance in the Western District of Pennsylvania at his arraignment hearing held on July 6, 2016.[1]  On July 8, 2016, this

---

[1] Before Lozano made his initial appearance in Western District of Pennsylvania, all seven of his co-defendants entered into formal plea agreements with the United States Attorney for the Western District of Pennsylvania.  In addition, each of the seven co-defendants' plea agreements contained a provision whereby the United States Attorney offered to recommend/move this Court for a total of a three-level downward adjustment for acceptance of responsibility which

Court ordered Lozano and his counsel to attend a status conference scheduled for August 10, 2016.[2]

At the status conference on August 15, 2016, Lozano's counsel indicated that it was possible that Lozano would plead guilty. ECF 219, ECF 395. During this status conference, the Court issued an Order reserving time on October 7, 2016 for either a change of plea hearing or a preliminary pretrial conference, depending entirely upon whether Lozano chose to plead guilty to one or both of the charges or go to trial. The Court also set the case for trial on October 24, 2016. Id. and ECF 220.

The Court continued the October 7, 2016 hearing/conference at the request of Defendant. ECF 268, ECF 269. The Court also continued the trial at the request of both Parties until January 17, 2017.

On November 12, 2016, the Court held a status conference with counsel notifying them that the trial date of January 17, 2017 was no longer feasible for the Court and, with counsel's approval, reset the trial for February 21, 2017. During this conference, the Court discussed some evidentiary issues. ECF 396.

A jury was selected on February 14, 2017, one week before the trial was scheduled to begin. On the morning that trial was to begin, February 21, 2017, Lozano and his counsel notified the Court that Lozano wanted to plead guilty. ECF 400. Lozano pled guilty, without a plea agreement; instead, he took an open plea and admitted his guilt to both of the charges. Id.

---

lessened each of the co-defendants' offense levels and thus, reduced their respective guideline ranges. Additionally, before Lozano made his initial appearance in the Western District of Pennsylvania, each of the seven co-defendants had appeared before this Court and had formally pled guilty to their respective charges as per their individual plea agreements.

[2] Defendant's counsel was not present at the August 10, 2016 conference, so this Court rescheduled it for August 15, 2016.

Following his plea, on June 22, 2017, this Court sentenced Lozano to 210 months at Count one and 210 months at Count two, to be served concurrently, and followed by a term of supervised release of 5 years at Count one and 3 years at Count two, also to run concurrently. ECF 387, ECF 388 and ECF 401. The Court also imposed the mandatory special assessment in the amount of $200.00, but waived a fine given Lozano's inability to pay a fine.

Lozano appealed his sentence on June 29, 2017. ECF 390. On December 20, 2018, the United States Court of Appeals for the Third Circuit upheld the Judgment of this Court, and on January 11, 2019, issued its Mandate. ECF 403 and ECF 404.

On December 10, 2019, Lozano filed his Motion to Vacate Sentence under 28 U.S.C. 2255. The Miller Notice was issued by this Court on December 19, 2019. ECF 415. Lozano filed his Notice of Intent on January 17, 2020 (ECF 416), and shortly thereafter, the Government filed its Response to Lozano's Section 2255 Motion. ECF 420. This matter is now ripe for disposition.

**B. Details of the Status / Pretrial Conferences**

The first status conference was held on August 15, 2016. ECF 395. By August 15, 2016, every one of Lozano's co-defendants in this case had entered into plea agreements with the Government and had pled guilty to their various charges. During this first conference with Lozano, the Court inquired whether Lozano would also be entering into a plea deal, or if the case should be listed for trial. Id. Lozano's counsel stated:

> After discussing the case with Mr. Nescott at length and discussing it with the defendant and studying the discovery in the case that has been disclosed so far, the defense thinks it's unlikely there is going to be a trial in question. As a matter of fact, I would say it's a very remote possibility. In the meantime, the government and defense continues to discuss plea options in the case and I would recommend at least a 90-day continuance of proceedings to continue those discussions and reach a completion to them.

Id.[3]  Lozano's attorney told the Court at this first conference that he was in need of discovery materials from the Government. In response, Government suggested as follows:

> MR. NESCOTT . . . Your Honor, I have gone as far as I could at this point telling defense counsel that A, B, and C, these witnesses are available and they would testify to this extent.  However, I would be willing to sit down with Mr. Cox and let him review the statements that have been made to this point.  Certainly, that should help spur along a resolution of this matter.
> THE COURT:  Is that helpful?
> MR. COX:  That would be very helpful, Your Honor.
> THE COURT:  That's a counsel-to-counsel meeting together and sharing the information so it's clear what we're talking about.

Id.  Shortly thereafter the Court and Lozano entered into the following exchange:

> THE COURT:  Are you having sufficient communication with your counsel?
> THE DEFENDANT:  Yes, Your Honor.
> THE COURT:  If you want to talk to him more today because it's only 9:45, so you can be down with the marshals -- do you want to talk to him more today? Do you want to talk to the defendant more today?
> THE DEFENDANT:  We made an arrangement already, Your Honor.  Thank you.  He is going to come see me.
> THE COURT:  At the prison?
> MR. COX:  Yes, Your Honor, I am.
> THE COURT:  I just wanted to make sure enough communication was occurring.  I appreciate it's not only whether someone is going to plead or not, it's what the terms of the plea agreement is at the end of the day.  I appreciate it isn't just a yes or no, there are details you need to work out but reviewing those statements would be helpful.  When would you be able to do that?
> MR. NESCOTT:  In a matter of days depending on Mr. Cox's schedule.
> THE COURT:  Before you leave, will the two of you make a date -- not to me but between yourselves so you don't have to email back and forth all week.
> MR. COX:  Yes, Your Honor.
> THE COURT:  Wonderful. Anything else you want us to deal with today?
> MR. COX:  No.
> THE COURT:  Sir, do you understand the path we are on?

---

[3] The Court declined to give the parties a 90-day continuance at this juncture; however, given that the trial was, over time, continued twice, with a start date of February 21, 2017, the parties did obtain a greater extension than the 90-day extension they requested.

THE DEFENDANT: Yes.

Id.

The second status conference was held on November 21, 2016. [ECF 396]. During this conference, the following exchange took place between defense counsel and this Court:

> MR. COX: So far, Your Honor. I would prefer not to try it, and we have been unable to come up with a plea that defendant will accept. And, you know, we're talking about fifteen years. So, it's a, a major decision for him.
> THE COURT: Certainly. I appreciate that.
> MR. COX: And, you know, the defense still has difficulties with what I consider inadequate discovery. I learned some new material the first time, new facts, today just talking to Mr. Nescott, who I have the greatest respect for. But, you know, I don't have any hard evidence at this point to present to the client to say if you go to trial this is going to happen, you're going to get convicted.
> THE COURT: So, what can we do to help in that regard, on behalf the government?
> MR. NESCOTT: Your Honor, if --
> THE COURT: Be comfortable. Be seated, please. Sorry.
> MR. NESCOTT: I have shared, I mean, the hard evidence, basically, comes from, apart from evidence of money orders, that's been turned over to the defendant. Hard evidence comes from the testimony of witnesses. I've provided those reports to Mr. Cox, but I reclaimed them at that point. But I did share them. But I told him, if it would move it along any, I would get him all the reports, he can sit down with his client, and share them. But there's apparently some different view from the prosecution and the defendant as far as what happened here. So, I will get all those to Mr. Cox and he can do with them what he will.
> THE COURT: Okay. Because most of these folks have already pled guilty; correct?
> MR. NESCOTT: They've all pled guilty; yes. Five or six of them will be witnesses for the government.
> THE COURT: Right. They've agreed to testify, at least, under oath, from their perspective, anyway, to the factual statements that are the predicate of their guilty pleas; correct?
> MR. NESCOTT: That's correct, Your Honor.
> THE COURT: Does that help?
> MR. COX: Well, yes, Your Honor. Here is what the defense has actually been presented with thus far. We have a, you know, like a three- or four-page list of money order numbers, but no copies of actual money orders showing the endorsement, who made payable to.
> THE COURT: Well, let's stop there.

Does the government have those exhibits and, if so, are they willing to produce them?

MR. NESCOTT: Whatever we have. Of course, we've indicated in discovery early on that defense could inspect anything and we would copy them for them. But well do that, if that's being requested. All the money orders, if we have the back sides, I will get those to Mr. Cox.

THE COURT: Is that what you would like?

MR. COX: That would be good, Your Honor.

THE COURT: Next, please?

MR. COX: The other item that was disclosed was a short interview of the client, in which he says nothing inculpatory. <u>And the government's theory appears to be that Mr. Lozano was the leader in a conspiracy which mailed cocaine from Texas to Pittsburgh, involved a crooked postmaster, who would, you know, divert these packages knowing they were coming to his post office, and would supply them to a man and woman who were the local ringleaders of the scheme.</u>

And the problems we're having are that, you know, I did briefly and fairly cursorily review the Jencks material. Mr. Nescott was very kind to show it to me. Of course, I didn't have any kind of time to think about it or anything like that. But I did note that Mr. Lozano's name is never mentioned in any of these statements. He's referred to, according to the government, as D. Well, I think referring to somebody as D is just too incoherent to supply evidence beyond a reasonable doubt. D? What does that mean? Then, the government claims that Mr. Lozano visited Pittsburgh at least twice. Mr. Lozano insists that he's never been in Pittsburgh. And as far as his visits, I would like to know when, approximately, they were, and how did he get here, was it a bus or a plane, did he drive, where did he stay? I mean, you know, some corroborating evidence that he actually came here.

THE COURT: Is there anything like that that you're willing to produce at this time?

MR. NESCOTT: Your Honor, the government has no evidence as far as how Dante Lozano got here. We have eyewitnesses, two or three, who will place him here, living here for actually two or three months at one point. So, again, there's no travel records that we can construct because we don't know how he got here. As far as Mr. Lozano, and this is a core issue. Mr. Lozano's just indicating, saying I've never been to Pittsburgh and I never came here to do this, where the witnesses will say he distributed to a guy named Biscey, who is now in prison. And when Biscey went to prison, the two new co-defendants here took over, and they both identify him as coming up here all the time, and that's how it all started going.

Id. (Emphasis added). The Court then set jury selection for February 14, 2017 and the trial for

February 21, 2017. Before adjourning the November 21, 2016 conference the Court stated:

THE COURT:  Well, I just encourage you to swap enough information.
But if it's a jury trial, that's fine. We should certainly be able to try it in,
you know, two or three days.  It doesn't seem that complicated.  And since
I've heard most of the pleas, I've at least heard some of the alleged
evidence.  Anything else you would like to talk about today?
MR. NESCOTT:  So I understand exactly what Mr. Cox is requesting.
We will provide copies of everything, money orders, we have about how
they were deposited, whatever we have.  I will provide witness statements
voluntarily early, as soon as I can get them together now.  And any other
hard evidence I have, if there's things that I don't know if it should be
copied, or there's a need, or it's voluminous, I'll invite Mr. Cox back to
take a look at and tell me what he wants.  If it's what he wants, we'll copy
it.
THE COURT:  That work for you?
MR. COX:  That's fine, Your Honor.
THE COURT:  Great.

Id.

The next conference was held on January 4, 2017.  ECF 397.  During this conference,

counsel for Defendant had to be joined by telephone, but Lozano and the assistant United States

Attorney were present in the courtroom when the following exchange occurred:

THE COURT:  Mr. Lozano, welcome.  Your counsel isn't here.  I have
received a letter from you, dated December 19, 2016.  Do you want me to
treat this as a motion for new counsel; is that what you are asking for?
THE DEFENDANT:  I have received nothing, Your Honor, on my case.
THE COURT:  You have to speak into the microphone, sir, so we can hear
you.  You may be seated and be comfortable, please.  So, you sent me a
letter; correct?
THE DEFENDANT:  Yes, Your Honor.
THE COURT:  That letter's dated December 19, 2016.  My question to
you is, are you asking for a new lawyer?  If you want a new lawyer I'll get
you a new lawyer.
THE DEFENDANT:  Not at this moment, Your Honor.  I, just because I
haven't received none of my discovery or nothing like that.
THE COURT:  Okay.  So, you wanted your discovery, and Jencks, and
other material; correct?
THE DEFENDANT:  Yes, Your Honor.
THE COURT:  What's the plan of the government in that regard?
                        *        *        *
MR. NESCOTT:  Thank you, Your Honor.  I advised Mr. Cox that I
would deliver to him at least a month before trial or as soon as possible,
they're actually sitting here, all but the, all the debriefings of all the

witnesses.  So, those are ready to be turned over.  If he doesn't appear today, I'll put them in the mail today to him.

THE COURT:  Why don't you send him two copies of everything so that he can then send along to the defendant?

MS. TUMOLO [COURT STAFF]:  He's in Harrisburg.  He's on hold on the phone.  Mr. Cox is now on the phone.

THE COURT:  We're going to try to get him on the line.

MR. NESCOTT:  I will do that, Your Honor.

MS. TUMOLO:  Mr. Cox, can you hear me?

MR. COX:  Yes.

MS. TUMOLO:  This is Lisa Tumolo.  You are live in Court.  Your client, Mr. Dante Lozano, is present, counsel for the government is present, and the Judge is on the bench.

MR. COX:  Yes.

\* \* \*

THE COURT:  Okay.  We've also received a letter from, from the defendant, dated December 19, 2016, raising concerns that you've not given him the material he needs in order to evaluate the case, that he's not received the probable cause affidavit, and other materials.  So, I think he's, I think the defendant needs some communication with you, which means physically going, you physically going, over there and meeting with him at the, at the prison in Ohio.  So, are you willing to do that?

MR. COX:  Yes, sir.  I certainly will.

THE COURT:  Would that be helpful to you, sir?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  So, what's going to happen is that the government is going to mail to you, Mr. Cox, the discovery and Jencks material.  He's actually going to send you two copies.  As soon as you receive that, which should occur sometime this week, then mail those over or take them over to Mr. Lozano and meet with him, because he has some important decisions to make and he needs information in order to make an intelligent decision about whether to go to trial or whether to plead.

MR. COX:  I understand.

\* \* \*

THE COURT:  All right.  So, have you seen this letter, Mr. Cox?  Have you seen this letter from the defendant?

MR. COX:  Your Honor, I have not.

THE COURT:  Okay.  We will fax it to you and then we want to hear from you what we need to do with this letter, because I need to get it on the record.  So, I either need to file it like as a motion for discovery, but I need, I need to know how it should be docketed. He wants you to stay as his counsel.  So, he's not asking for new counsel.  But I need to know exactly what this document needs to be [titled].  So, I'm going to send it to you immediately and then I would like you to get back to my staff today telling me how it should be docketed, because I don't like letters from defendants not being on the docket, because that's the only way anyone,

including the appellate court, can review the case, is to have the matter put onto the docket. Understand?

MR. COX: Your Honor, my fax machine is not working at the moment.

THE COURT: You got an e-mail?

MR. COX: That would be great.

THE COURT: Okay. We'll e-mail it to you.

MR. COX: Okay. That would be great, Your Honor. And I will go see the defendant tomorrow or Thursday.

THE COURT: Well, you may want to wait until you get the discovery material that's going to be mailed out to you today.

MR. COX: Very good.

\* \* \*

THE COURT: Are you satisfied with what we've done today for you?

THE DEFENDANT: Yes, sir. Yes, Your Honor. Thank you.

THE COURT: All right. I'll send out a new pretrial order with some new dates, and because we have a final pretrial coming up. The final pretrial is on February 14. But if we need to get together for a status conference, either because there's going to be a plea or there's some other issues that have been raised by the defendant, then you need to tell me. You need to file a motion for a status conference, and I'll get that promptly scheduled, because we're choosing the jury the same day as the final pretrial conference.

MR. COX: Yes, sir. I understand.

THE COURT: We're selecting the jury on February 14 and then the trial will start the twenty-first. But the final pretrial is the same day as the jury selection. All right?

MR. COX: Yes, sir Your Honor.

THE COURT: Thank you, all. The marshals may remove the defendant, and I'll see you either at an upcoming status conference or at the final pretrial.

MR. COX: Yes, Your Honor. Thank you.

Id.

The next conference was a preliminary pretrial conference which was held on February 7, 2017. ECF 398. After going through all of the procedural matters with counsel, the Court and Lozano had the following discussion:

THE COURT: Sir, have you had adequate time to talk to your attorney throughout this process, now?

THE DEFENDANT: Yes, Your Honor. Little bit. I just like to have a little bit more time to talk to my lawyer, if it's possible.

> THE COURT:  Then I'll ask, do you have some time, it's now eleven o'clock, on behalf of defense counsel, do you have time now to meet with the defendant?
>
> MR. COX:  It would be better if I went over to see him at NEOCC. Again, I saw him on Thursday and I'll see him again on Monday.  We've already discussed this.
>
> THE COURT:  Okay.  Is that satisfactory?
>
> THE DEFENDANT: Yes, Your Honor.
>
> *    *    *
>
> THE COURT: We'll have this podium turned around so that you can make your openings and closings facing the jury. The only thing I would ask is that you should always stand near a microphone so we can hear you. If you're not personally speaking into a microphone, it's difficult for everyone to hear.  Sir, anything you want to talk to your lawyer about before you leave?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Take a moment and chat about it with him. Move the microphone away, so we don't hear.
>
> (Whereupon, an off-the-record discussion was had.)
>
> THE COURT: You've had adequate time now to chat?
>
> MR. COX: Yes, Your Honor.
>
> THE DEFENDANT: Yes.
>
> MR. COX: We're just clarifying our visit for next week.
>
> THE COURT: Wonderful.

Id.

The following week, on February 14, 2017, the morning of jury selection, Lozano reported to the Court that he and his attorney were <u>not</u> getting along, and he wanted to have a new attorney appointed to defend him.  The following is the discussion between the Court and Lozano:

> THE COURT:  Okay.  Good morning.  This is the time and place for jury selection, pursuant to my previous order of Court.
>
> *    *    *
>
> THE COURT:  Okay.  Pursuant to my order of Court, is the government ready to proceed with the selection of the jury today?
>
> MR. NESCOTT:  The government is, Your Honor.
>
> THE COURT:  On behalf the defendant?
>
> MR. COX:  Yes, Your Honor.
>
> THE COURT:  Are you ready to proceed, sir, for the selection of the jury?
>
> DEFENDANT:  I would like to, to address the Court, please.
>
> THE COURT:  Pull the microphone closer to you.  You may proceed.

THE DEFENDANT: Your Honor, with all due respect, Your Honor, I would like to, I would like to point some issues to the Court here so they can be of record.

THE COURT: Continue, please.

MR. COX: Sir, I would like to get a new counsel, sir, please, because the one that I have now is inadequate.

THE COURT: Explain, please.

THE DEFENDANT: Well, our differences are too great, sir. Everything has all been a detrimental breakdown in our communication that is beyond repair. And I would like to exercise my Sixth Amendment right to adequate and effective counsel, Your Honor.

THE COURT: You raised that issue, previously; correct, sir? In a letter dated December 19, 2016; correct?

THE DEFENDANT: Yes, Your Honor, but I just got, I received everything that I, just like about three weeks ago, Your Honor. I'm not, I'm in this case and I need more time. But I need adequate and effective counsel, too, Your Honor.

THE COURT: I will direct that your letter of December 19, 2016 be filed of record. I previously asked you, I believe, whether you wanted that filed during our January 4, 2017 conference. You said you didn't want it to be filed. But I think we now need to file it. Sir, on January 4, 2017, you were before this Court and your attorney was present by telephone. At that time, the Court informed your counsel that you had mailed a letter to the Court asking for new counsel. That's the letter I just mentioned of December 19, 2016. I told you, if you wanted a new attorney, that you could have a new attorney, but we wouldn't continue the trial date. We discussed at length what your options were. After much discussion, you informed the Court that you wished to proceed with Mr. Cox as your counsel. Since January 4, 2017, the attorneys for the government and Mr. Cox, your attorney, have been working hard in preparing for this trial. The Court, also, with the staff, has been preparing diligently for trial. We currently have, approximately, fifty jurors that have been sitting for over an hour to be part of the jury selection process. They're down in the jury assembly room. They have been waiting for us. When we met last week, you were present on February 7, 2017, at the final pretrial conference and we discussed all final matters prior to jury selection, which is going to occur today. At no time last week while you were present at that pretrial conference did you raise the issue with this Court that you wanted new counsel. Based on your representations, quite frankly, sir, the Court has doubts that you're dissatisfied with your attorney, but rather you believe you may be upset with the frank discussions he has had with you about the risk that you face in going to this trial. I presume that you, counsel, you have discussed with the defendant the evidence that will be presented, possible potential outcomes in your case, and your expansive experience with the nature of jury selection in the Western District of Pennsylvania; correct?

MR. COX: Yes, Your Honor. Your Honor, we have gone over the evidence in this case since it became available, in person, many times in detail. Yesterday, in the most detail, because the government had supplied us with some additional evidence. I had to give Mr. Lozano my frank analysis of this evidence and how it was going to affect him if we were to go to trial.

THE COURT: Understand.

MR. COX: He did not like that. He would like magic and I'm not a magician. I have to deal with the evidence as it is. I'll do a good job for him, as well as I can, but the evidence is harsh and the outcome is pretty foreclosed at this point. There is nothing we can do except go to trial or plead guilty. If he elects to go to trial, we'll try the case.

THE COURT: Fine. And we will do that today. I've had Mr. Cox in my Courtroom many times on several trials and he's an experienced and accomplished criminal defense attorney. I've no doubt, sir, that he will defend you to the best of his ability, given the evidence the government plans to present to the jury during this trial. And if he's told you things that you didn't want to hear, he did that because he's bound by his ethical obligation to be candid with you about your case. But as he's just said, he stands willing to defend to you the best of his ability, but he can't change whatever the evidence is that's going to be presented. So, we're going to go pick a jury this morning.

THE DEFENDANT: Your Honor, can I speak, please? Can I address the Court, Your Honor?

THE COURT: I'm not done speaking, but when I am done you may.

THE DEFENDANT: I'm sorry.

THE COURT: This trial has been continued on numerous occasions at the request of defendant and/or defense counsel. I think this is the third trial date that's been set. We had a jury selection set for October 24, 2016, and again on January 17, 2017, and then today, which is February 14, 2017. So, this is the third jury selection date that we have set. And we will proceed with the selection of the jury momentarily. You may say whatever you would like to say, sir.

THE DEFENDANT: Sir, Your Honor, with all due respect, Your Honor, he said many times. I have, just up to yesterday, he told me because the government has not, has not offered me anything. I know the outcome of my, of the charges that I am facing. And it is not because of that, Your Honor. I have proof here where I sent to him a, a discovery that I filed, a motion for a pretrial discovery, since the twelfth day of September, Your Honor. If you want to see it, here it is. And I've got my discovery up to like three weeks ago, Your Honor. I don't have enough time to prepare for trial, Your Honor. And, like I said, our differences are too great. There has been a detrimental breakdown in our communication that is beyond repair, Your Honor. I would like to exercise my Sixth Amendment right to adequate and effective representation, Your Honor.

THE COURT: Okay. Your motion for a new counsel was denied as being untimely and as being filed solely for the purpose of delaying this trial. So, this is the third time we changed the trial date based on motions.

THE DEFENDANT: Your Honor, but I was not aware of any of the motions that have been filed, Your Honor.

THE COURT: Sir, you said that to me the last time and I gave you a whole stack of papers at one of the earlier conferences. So, we're ready to proceed. So, we need to get this gentleman some clothes. I've got a jury that's been waiting down there, now, for over an hour.

THE DEFENDANT: I don't want this man to represent me, Your Honor.

THE COURT: You want to represent -- you've got two choices. You want to represent yourself today?

THE DEFENDANT: No, sir. I would like to exercise my Sixth Amendment right to adequate and effective counsel, Your Honor.

THE COURT: Motion's denied, sir.

THE DEFENDANT: With all due respect, Your Honor, I have not had an enough time. I'm ignorant to this case, Your Honor. I'm in the dark.

THE COURT: Sir, I don't believe you, to be quite frank.

THE DEFENDANT: I have no reason to lie. I know the outcome of the charges I am facing, Your Honor. I'm being truthful with you, Your Honor, with all due respect.

THE COURT: What are we going to do about getting some this gentleman some clothes to wear. He is in prison garb.

THE DEFENDANT: If this man is going to represent me, I don't want to be here, Your Honor. I can't be here, Your Honor. I don't need this man. I told you, we don't have any communication, Your Honor.

THE COURT: I appreciate knowing --

THE DEFENDANT: I'm being truthful to you, Your Honor. I don't feel, I mean, --

THE COURT: Sir, would you kindly sit down?

THE DEFENDANT: Yes, Your Honor.

THE COURT: I've ruled on your motion. I'm trying to get you some clothes so you're not here in orange. I have a tie for the gentleman, if he needs it. What other clothes do we have coming?

MS. KRINGS [COURT STAFF]: We haven't heard back from Probation, yet.

THE COURT: Well, somebody needs to go down to Probation, physically, to see where the clothes are. Did you bring any clothes for the gentleman?

MR. COX: No, Your Honor. I must confess. I had focused on that for trial, but it escaped me for today. And I apologize to the Court.

THE COURT: That's fine. We've got ties. We've got a jacket.

THE DEFENDANT: Your Honor, I was not even made aware, Your Honor, of asking any of my family for clothes. He haven't even told me none of this, Your Honor.

MR. COX:  Your Honor, he seems to have an unending supply of complaints, but we never discussed clothes.  He knew we were coming here to be, to face the potential jurors.

THE COURT:  That's fine.  We're not debating.  We're going to do our best to try to find this gentleman some clothes today.  So, if everyone sort of sits down, we'll see what we can do to help work out this matter.

THE DEFENDANT:  Your Honor, can you please see this paper, Your Honor?  That I have claimed to bring here, Your Honor?

THE COURT:  Sure.  Hand it up.

THE DEFENDANT:  (Indicating.)

THE COURT:  Okay.  The defendant has handed me a document that consists of four pages, dated September 12, 2016.  Raises many of the issues that he's raised before about so-called lack of information. Has the government produced everything required to be produced, sir?

MR. NESCOTT:  Everything, Your Honor.

THE COURT:  You may remain seated, please.

MR. NESCOTT:  Everything, Your Honor, including there was a correction in an earlier report that I gave to defense counsel today.  It was a minor, minor correction.

THE COURT:  All right.  We'll direct that this document that the defendant just handed to me to be also filed on ECF.

THE DEFENDANT:  Your Honor, can I address the Court, please, Your Honor?

MR. COX:  No.  Just a minute, sir.  Your Honor, for the record, as the defense counsel here, I have filed every single piece of paper that I've gotten from the government I've sent a copy to the defendant. Where's you copy of that?

THE DEFENDANT:  Just discovery.  I got it like three weeks ago, Your Honor.

MR. COX:  He got it, as I received it from the government, Your Honor.

THE COURT:  Fine.  Okay.

THE DEFENDANT:  Your Honor, I need time to prepare for this, this trial, Your Honor.  I just got everything that I needed, Your Honor, three weeks ago, as you see in that paper.  I sent that motion to him on the twelfth day of September, Your Honor.

THE COURT:  Sir, you're just seeking to delay the trial.  If this issue was going on since September, then you should have raised it earlier.  You didn't --

THE DEFENDANT:  I did not know, Your Honor.

THE COURT:  Sir, you're talking over me and that it hard on the court reporter.

THE DEFENDANT:  I'm sorry, Your Honor.

THE COURT:  You were here last week, you knew we were going to pick a jury, and you never raised an issue.  So, I'll ask the marshals to take you back down till we get his clothing.  Thank you, sir.

THE DEFENDANT: Your Honor, I just like to ask again, sir. Today I want to exercise my Sixth Amendment right to effective and adequate counsel, Your Honor. I need help, Your Honor. Can you please help me, sir, as a United States citizen?

THE COURT: Sir, I've denied your motion. You've had extensive continuances, including this being the third trial date. To me, it's obvious to me you don't want to try this case, and we're going to go ahead and try this.

THE DEFENDANT: I cannot have a lawyer that does not believe me, Your Honor. That is ineffective counsel, Your Honor, with all due respect.

THE COURT: Then the United States Court of Appeals for the Third Circuit, I'm sure, will give your argument serious consideration, should a jury find against you. Thank you, sir.

THE DEFENDANT: What does the government have to offer before we go on to trial, Your Honor?

THE COURT: Sir, I'm not here to engage in plea bargaining back and forth. If you don't like the government's offer, then you go to trial.

THE DEFENDANT: I don't even know what the government offer is, Your Honor.

(Whereupon, Defendant was removed from the courtroom, and the following was had in open Court.)

*         *         *

THE COURT: Defendant's back this the courtroom. He is now in civilian clothing. Thank you, sir. Good to have you back.

THE DEFENDANT: Welcome.

THE COURT: So, I'm going to put on the record first about, at least in general terms, the plea negotiations on behalf of the government. So, if you can just give me a summary of the plea negotiations that have occurred to date?

MR. NESCOTT: Your Honor, there have been no formal written offers. There has been discussion about the parameters of the potential penalties counsel has discussed with me many times.

THE COURT: Defense counsel?

MR. NESCOTT: Defense counsel. The mandatory minimum involved of ten years and the fact that with a conviction on both counts, and depending on any prior record, how it could range upward from there, I believe, to a high of fifteen years may have been discussed. But the main point of the discussions was that Mr. Cox informed me that the defendant wanted to get a sentence that would be below what the conspirators, some of the conspirators have received. In other words, they pled to a five-to-fifteen-year Guidelines range for the cocaine. I told him, clearly, the government could not offer this defendant, as the alleged supplier, less than that five-to-fifteen kilogram range. That's, basically, where we were consistently. As recently as a few days ago, Mr. Cox again asked whether anything else could be done. And it's been the same response, that we can't [,] we

couldn't permit [this] defendant to plead to a quantity less than that of those he was allegedly supplying.

THE COURT: Did you, as counsel for the defendant, pass this various information and relating to the terms of any plea agreement to the defendant?

MR. COX: I relayed them immediately, as soon as I received them from the government, to the defendant.

THE COURT: On more than one occasion?

MR. COX: More than one occasion. Many occasions, including yesterday.

THE COURT: All right.

THE DEFENDANT: Can I address the Court, Your Honor?

THE COURT: Sir. Yes.

THE DEFENDANT: Your Honor, with all due respect, up until right now, did U.S.D.A. Nescott has spoken that I am aware of now of the plea. I mean, I'm willing, I told my attorney to plead guilty, but I need plead guilty to something reasonable, Your Honor.

And those are the issues, those are the issues that I want to bring up and my waiting for the, to have rights to bring up these issues and motions that have to be filed before, because I believe, Your Honor, I don't know if it's found correct, trial would be the last option after exhausting all the options I do have. I have not been given those options, Your Honor, before going to trial.

THE COURT: Well, we're going to pick a jury this morning and then you will have until, you'll have, today is Tuesday. So, you'll have Wednesday, Thursday, and Friday to work something out with the government. And if not, then we'll start the trial on Monday. So, you have three days to work on this matter. But, obviously, the government believes that the prior guilty pleas with other co-defendants somewhat limits the ability of the government to negotiate something other than what they've done, what the government's done with other defendants. I do, sir, want to warn you that we're going to pick a jury. And if you're disruptive in this process, then I'll have to order you removed from the courtroom. So, I encourage you to work with your attorney. I encourage you to stay seated. But if you become disruptive, then I will be forced to, unfortunately, to have you removed. Do you understand, sir?

THE DEFENDANT: Yes, Your Honor. I'm sorry. I apologize for the way I acted right now, Your Honor. I just wanted to, you know, for it to be known the way that I feel, Your Honor.

THE COURT: Okay. Fine. I understand, but I also want to make sure that you can lose your right to be present at trial if, after being warned, that he will be removed if he continues the disruptive behavior. If he, nevertheless, continues conducting his disorderly and disrespectful behavior to the court, that the trial cannot be carried on with him in the courtroom. If you lose that right and you are removed, you can reclaim that right at any time as long as you are willing to conduct yourself with

the decorum and respect inherent in the concepts of the Courts and judicial proceedings. Understand, sir?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. I would ask that the jury pool be brought up.

MR. NESCOTT: For the record Your Honor. The Court just stated the trial would start next Monday. That, of course, is Washington's birthday. We're scheduled to start next Tuesday.

THE COURT: Thank you for that correction. Thanks. We are starting with Tuesday, which is one of the reasons why we're picking the jury a week ahead of time, so the jurors will already be selected and we can start promptly on next Tuesday with the trial. Thank you for that correction. Okay? Deputy Clerk will go down get the jury.

\*       \*       \*

(Whereupon, the jury was retired to the jury room, and the following was had in open Court .)

THE COURT: Anything else, on behalf the government?

MR. NESCOTT: Nothing else, Your Honor.

THE COURT: Defendant?

MR. COX: No. Thank you, Your Honor.

THE COURT: Okay. Do you want him to stay down there for a little bit, so you can go down, chat with him? Or have you had enough time to chat with him.

MR. COX: No, Your Honor. I have the flu so bad, I want to get home and see you in a couple days.

THE COURT: Again, you have Wednesday, Thursday, Friday, or you all will chat to the extent that you wish to; all right? Take care. Everyone should remain seated. The  marshals may remove the defendant.

Id.

Following the lengthy jury selection day discussion among the Court, counsel for the both parties and Lozano, the Court next convened on Tuesday, February 21, 2017, to begin the trial in this matter. However, before the jury was seated, Lozano indicated that he wanted to plead guilty. ECF 400. As a result, the first day of what would had been a trial, became a change of plea hearing. The following transcript segments highlight the pertinent parts of the change of plea hearing:

THE COURT: The Court is informed that you wish to change the plea you previously entered to a plea of guilty to one count of conspiracy to distribute and possession with intent to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a

Schedule II controlled substance, in violation of Title 21, United States Code Section 846, and to plead guilty to one count of conspiracy to launder monetary instruments, in violation of Title 18, United States Code, Section 1946(h). Is that correct, sir?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And you have had more than adequate time to discuss this matter over a lengthy period of time, including today with your counsel; correct?

THE DEFENDANT: Well, we just discussed about this agreement right now, Your Honor. Yes.

THE COURT: But he has been discussing with you the pros and cons our defense counsel has been discussing with you throughout this case, the advantages and disadvantages of the benefits and risks of whether to plead guilty or not; correct?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Including up until today?

THE DEFENDANT: Yes, Your Honor.

&ast;  &ast;  &ast;

THE COURT: On behalf the government, would you please place on the record the evidence that would be offered by the government as to these two charges? If you need a few moments to gather your papers, that's fine.

MR. NESCOTT: Yes, Your Honor. I'll just ask for a couple moments. The government is ready to proceed, Your Honor.

THE COURT: You may.

MR. NESCOTT: Your Honor, the government is prepared to prove through calling of a series of witnesses that before 2011, a man by the name of George Biscey, B-I-S-C-E-Y, was a cocaine distributor here in the Western District of Pennsylvania. He supplied Jeffrey Turner and other people with quantities of cocaine for use and resale.

In 2011, Mr. Biscey was arrested and convicted of distribution of cocaine. He was sentenced to a term of prison. At that time, he contacted Mr. Turner and told Mr. Turner that he wanted Turner that he wanted Turner to take over for him and he supplied the contact number for this 24 defendant, Dante Lozano, although, Lozano was only known by the initial D to Turner at this time.

Mr. Turner, and also Mr. Biscey, provided Turner with the contact number of a postmaster up here in Western Pennsylvania at the West Newton Office, Joseph Borelli. Mr. Turner, ultimately, got in contact with D, this defendant, and Mr. Borelli.

At one point, Mr. Lozano agreed to start supplying cocaine to Turner. At first, Turner had to send four thousand dollars down for the first four ounces or so that were supposed to come up here.

That deal went through and at sometime thereafter the dealing began on a regular basis with packages of cocaine arriving here, two to four times a month or more from Mr. Lozano, weighing four and a half up

to nine or ten ounces each time, and payments in thousands of dollars were sent back to Texas.

For a period of six months, those dollars, those drug proceeds, were sent back to Lozano through money orders purchased up here by Jeffrey Kettering and by his uncle, William Colson, at the direction of Mr. Turner. They would purchase the money orders at eleven different Post Offices in the Mon Valley area of Western Pennsylvania, buying only nineteen hundred dollars or so at a time, in two postal money orders each time, sending them down to Texas with blank names of seller of a purchaser and receiver. And those names would be filled in in Texas, commonly with the name Hugo Balboa, a co-conspirator in this case, and another several other Balboa names and some other names.

The directions to send the money orders back were all given by Mr. Lozano by text. He texted where he wanted them sent to a Jeffrey Turner and April Racan and then they would fill out the envelopes and send them down to Texas.

The period of this cocaine dealing went on from 2011 until December 23 of 2014. Again, the number of packages was estimated to be as many as a hundred or a hundred and fifty during that period of time. And this conspiracy almost came to a halt by December 23 when a package was intercepted coming from Texas to an address on Dalewood Drive in McKeesport, the home of April Racan's parents.

It was intercepted by Postal Inspector Stephen Celletti. He got a federal search warrant. It was opened and found to contain about a quarter kilo of cocaine. The package was controlled delivered. April Racan was arrested [] she admitted her knowledge of what was going on, her and her role in having these packages of cash sent down to Texas to Lozano.

Lozano, again, would send, would text the addresses where he wanted the cash sent [] then the labels would be filled out usually by April Racan.

Jeffrey Turner was apprehended a few days later and he admitted also that he had been doing this for years, with D, the man he knew in Texas.

Both Turner and Racan would testify that they met D when he came to Western Pennsylvania on at least one occasion. He stayed for a month or two with George Biscey they saw him there. They partied with him. They saw him numerous times on that visit. Also, on one occasion, April Racan took the defendant to Blainhill Volunteer Fire Company, which was the hangout for these people, the local hangout for these people.

After the package was intercepted in McKeesport, postal inspectors had April Racan contact Lozano [and] tell him that she didn't have all his money for that package, because they, obviously, did not tell him it had been intercepted. She said she could send him the twenty-five hundred dollars.

There followed a series of text messages between April Racan and Mr. Lozano on Racan's phone on which she identified as Lozano's phone. Those texts would have been presented here in Court. Basically, in those, Mr. Lozano indicates his unhappiness over the amount of money she's sending, that his people are upset with him, she had to send it as soon as possible. He refers to his April on the call. He refers to the amount, the twenty-five hundred dollars and he gives her the address where she should send this package of cash. The cash is packaged up [and] sent down to Texas to the address. But, unfortunately, surveillance could not find who picked up that package, it was lost at that point.

Mr. Borelli, the postmaster -- bless you. Mr. Borelli would testify that he had been recruited by George Biscey to get addresses where the cocaine could be sent over a period of years. That is to say, empty homes, where it could be addressed there, to A post office box that he set up. And when the packages came into the post office, Mr. Borelli would intercept them. When they're on the table with the mail being sorted, he usually grabbed them at that point [and] then delivered them to, first, Mr. Biscey [and] then to Mr. Turner 2 Ms. Racan.

At some times, they were delivered to the empty homes [and] Turner or Racan would pick them up there. Mr. Borelli also would testify that he advised Turner, and Racan, [and] Biscey not to send more than twelve, thirteen thousand dollars, not to -- I'm sorry -- not to purchase money orders in high amounts because they would be tagged [and] watched by the Post Office.

On the other end of things, the government is prepared to call Daniel Cosme, who is the manager of a Dairy Queen at South Padre Island, Texas, not far from Brownsville, Texas, where most of the other activity was taking place and where Mr. Lozano lived. Mr. Cosme would testify that he was approached by Lozano and asked to accept packages for Lozano at the Dairy Queen, since he was the manager. He did so. The first few packages he found were pornographic materials, but then he became suspicious. When he spoke with Lozano, Lozano to pay him up to three hundred dollars per package that he accepted for Lozano. And Mr. Cosme would then deliver the packages that came in for Lozano. He suspected it was cash of some sort or money orders, but he didn't know. But he delivered them to Lozano and he was paid for doing that.

Mr. Cosme would also testify that frequently the packages came in the name from a sender Sarah Post. [And], in fact, Ms. Racan would testify that that is a name that she commonly used to send cash down to the Dairy Queen and she put Sarah Post on the envelopes.

Further, from the Texas end of things, Your Honor, there were four other incidents that should be mentioned that the government would call witnesses from Texas to testify.

First, that on the eighth of April of 2014, surveillance was set up on Dante Lozano as he went to different locations in the town of Brownsville. They got a surveillance photo or several of him walking

around in a white T-shirt. Agents then followed him into two Post Offices. There were two Post Offices in Brownsville [and] the first he went into was the Las Evanos Post Office in Brownsville. He was in there filling out an envelope or a postal envelope and they watched him over by a machine where you can fill out the label and pay the postage and mail the thing without ever approaching a teller or worker in the office.

Mr. Lozano, on that date, filled out a label [and] sent a package up here to Western Pennsylvania to one of the addresses that had been provided to him by Postmaster Borelli. That label was copied by this machine [and] retrieved by Postal Inspector Celletti. Also, there was a picture of Mr. Lozano standing above that machine, blurry, but still you could see a man in a white T-shirt and bald head, which matched the description of a man who was standing at the machine at that time and identified by agents in Texas as Dante Lozano.

The agents then followed Mr. Lozano to the second Post Office, where he also walked in with an envelope [and] was doing something with that envelope.

Secondly, in Texas, on the tenth of September of 2014, agents were up on surveillance of Mr. Lozano. They watched him go to the house. Actually, they were up on a house of the suspected supplier of cocaine. They watched Lozano go in, [and] come out, get in his car. He was driven away by his wife or girl friend. A few blocks away, the car was stopped. Agents watched as he opened the hood, took something out from the car, and placed it under the hood, and then closed the hood.

Shortly thereafter, there was a traffic stop on Mr. Lozano and agents found inside the hood, under the hood, inside the air filter compartment, about a quarter kilo of cocaine in two bags. And that cocaine, as well as all the other drugs seized in this case, the fact that it was cocaine the amount would be stipulated to by the defense.

 The defendant, at this time, gave a signed statement to investigator Carlos Martinez, admitting that he had picked up this cocaine and offering to cooperate against his supplier.

 Five days later, DEA called, DEA in Brownsville called, Mr. Lozano [and] told them they were looking at an investigation, would he mind stopping in to talk with them. He agreed to do so. He stopped by. He waived his Miranda rights and they had a short discussion with them. He didn't admit too much of anything, but he did say at one point that he wanted to get out of the life of crime so he could be a good father to his young daughter.

And the final event in Texas, about which there would be testimony, is that on the fourth of December of 2014, a gift shop in Brownsville received a large package in a big envelope that had bee[n] returned for lack of postage. It had been mailed from Brownsville, sent to an address up here in Pittsburgh, but it never made that it far.

The owner of the shop, Diana Mauso, would testify that she opened that package [and] she didn't remember sending it, even though it

carried the return address of her gift shop. She opened it [and] found about a quarter of kilo of cocaine inside that package. Or what she thought was cocaine.

She called it to the attention of her husband, who was then an assistant district attorney. He called the police. The police, DEA, came in. They picked up the package. They sent it to the lab. And the postmaster up there would indicate that the address where that package was going was an address that he had supplied to Dante Lozano to send his drugs up here.

That is a rather long summary, but that is a summary of the evidence the government is prepared to present, Your Honor.

THE COURT: What do you understand the stipulation is as to the amount of the drugs?

MR. NESCOTT: Well, there are six separate stipulations, Your Honor.

THE COURT: Would you kindly be able to read those on to the record, now?

MR. NESCOTT: Yes. Yes, Your Honor. The, first, actually --

THE COURT: Mr. Lozano, pay really careful attention to what's being read now, please.

MR. NESCOTT: Well, this, of course, is a summary here, is a small portion because it's a conspiracy, the total amount.

THE COURT: Understand.

MR. NESCOTT: But, in any case, the first three stipulations are to sales made by co-defendant Brian Kettering to the Attorney General's Office. The stipulation is that from the controlled buy on November 15, 2012, the total weight was 27.4 grams, positive for cocaine. That would be about one ounce.

The second stipulation is that on January 14, 2013, there was a controlled buy from Brian Kettering by the Attorney General's Office. And that cocaine weighed 55.9 grams or about two ounces.

The third stipulation is that on April 30, 2013, there was a seizure from Brian Kettering in Rostraver Township of one hundred and sixty-five grams. Excuse me. Or about six ounces of cocaine, positive for cocaine. Mr. Kettering would testify that, yes, he made all these sales of cocaine he got from Jeffrey Turner and Turner from this defendant.

The fourth stipulation has to do with a controlled buy that Frank Kettering made from Jeffrey Turner on April 24, 2014, once Kettering started working with the officers in this case. [And] that controlled buy was, weighed [and] found to be 28.2 grams or about one ounce of cocaine.

The fifth stipulation has to do with the seizure from the air filter compartment of black Chevy Blazer in Brownsville Texas, in which defendant was a passenger on September 10, 2014. It weighed 250.95 grams or one quarter kilogram.

The final stipulation has do with the package delivered to Dalewood Drive, McKeesport, on December 23, 2014. That was a

package that was intended for April Racan.  The contents, 246.23 grams or nearly a quarter kilogram, positive for cocaine.

Those are the stipulations, Your Honor.

THE COURT:  Sir, in a moment, I will ask you about whether you agree with the government summary of what you did, but, first, you understand your answers may be used against you in a prosecution for perjury or of making a false statement if you do not answer truthfully?

THE DEFENDANT:  Yes Your Honor.

THE COURT:  Do you agree with the prosecution summary of what you did?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Are there any additions or corrections you wish to make?

THE DEFENDANT:  Not at this moment.

THE COURT:  Well, now would be the time if you want any additions or corrections.  So, you might want to take a few moments to talk to your attorney, please.

(Whereupon, an off-the-record discussion was had.)

THE COURT:  Thank you for doing that.

THE DEFENDANT:  I'm prepared, Your Honor.  Sorry about that.

THE COURT:  No problem.  Did you have have enough time to talk to your attorney?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Are there any additions or corrections you wish to make?

THE DEFENDANT:  No, Your Honor.

THE COURT:  The Court finds that there's a factual basis to accept defendant's plea of guilty to the two offenses charged in the indictment. Sir, having been advised of all your rights, do you still intend to plead guilty today?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Counsel, is this consistent with your advice?

MR. COX:  It is, Your Honor.

THE COURT:  Sir, has anyone forced you in any way to enter a plea of guilty to these charges?

THE DEFENDANT:  No, Your Honor.

THE COURT:  Did you make this decision to plead guilty of your own free will and voluntarily?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Have you understood everything we've discussed here today?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Have you ever had any physical or mental illness that affects your ability to understand these proceedings or my explanation of your rights?

THE DEFENDANT:  No, Your Honor.

THE COURT:  Counsel, do you have any doubt about the defendant's competency to plead guilty?

MR. COX:  No, Your Honor.

THE COURT:  Sir, are you completely satisfied with your attorney's advice and representation?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Is there anything you have asked him to do that he hasn't done?

THE DEFENDANT:  No, Your Honor.

THE COURT:  Has he done everything you have asked him to do?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Counsel, I'm going to review what I understand to be the maximum sentence I'm authorized to impose under the law for these two counts.  So, would you follow along with me and make sure I get it accurate, please?

THE DEFENDANT:  Yes.

THE COURT: sir, the maximum sentence I'm authorized to impose under the law, including any applicable mandatory minimums, for the commission of these offenses which you intend to plead guilty is, at Count One, a term of imprisonment of not less than ten years, to a maximum of life imprisonment, a fine not to exceed ten thousand dollars, a term of supervised release of at least five years.

For a second felony drug conviction that is final, whether federal, state or foreign, a term of imprisonment of not less than twenty years to a maximum of life, a fine of not to exceed twenty thousand dollars, and the term of imprisonment of at least, term of supervised release of at least ten years.

For a third or subsequent felony drug conviction that is final, whether federal, state, or foreign, a mandatory sentence of life imprisonment, and a fine not to exceed -- what is the dollar amount?

MR. NESCOTT:  The amount is twenty million dollars.

THE COURT:  Okay.  As to Count One, first time, is ten million dollars?

MR. NESCOTT:  The first time is ten million dollars, As to the second and subsequent, Your Honor, the government has not filed an 851 information in this case and does not intend to.  So, they would not apply.  Only the first offense would.

THE COURT:  Okay.  So, is the government saying that as to Count One the term of imprisonment is not less than ten years, to a maximum of life, a fine of not to exceed ten million dollars, and a term of supervised release of at least five years?

MR. NESCOTT:  That's correct, Your Honor.

THE COURT:  And as to Count Two, a term of imprisonment of not more than twenty years, a fine of not more than five hundred thousand dollars, or twice the value of the property involved in the transaction, whichever is greater, and that the sentence includes a term of imprisonment.  The Court may impose a period of supervised release of not more than three years.

Also, there's a special mandatory special assessment of one hundred dollars which must be imposed at each of the two counts upon which the defendant is pleading guilty.

Sir, do you understand the potential sentence the Court is authorized to impose?

THE DEFENDANT: Excuse me, Your Honor. I didn't hear you. I'm sorry.

THE COURT: Do you understand, do you understand the potential sentence that the Court is authorized to impose as to these two counts?

THE DEFENDANT: Yes, Your Honor.

\*       \*       \*

THE COURT: Do you understand I'm required to consider the Guidelines adopted by the United States Sentencing Commission before reaching an appropriate sentence, but that those Guidelines are advisory and not binding on this Court?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Have you and your attorney discussed how the Guidelines might apply in your case?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand the Court will not be able to determine your advisory Guideline sentence until after I review the presentence investigation report and you and the government have had an opportunity to challenge the reported facts and the Probation Office's calculation, application and calculation of the Guidelines?

THE DEFENDANT: Yes, Your Honor.

THE COURT: What is the government's position as to the applicable advisory Guideline range?

MR. NESCOTT: Your Honor, the Guidelines range for the drugs involved here are five to fifteen kilos. The basic offense level is 30. The money laundering conspiracy count, because it involves the additional two levels for a conspiracy, the Guidelines range would be 32, total Guideline range. For acceptance of responsibility, the defendant would be for two points and not the third, because the trial was prepared for. That would reduce it back down to a level 30. The prior criminal history appears to be a category IV, based on two priors and the fact that he was on probation when he committed this crime. Bottom line is that a plea would be a level 30, Roman Numeral IV, or one hundred and thirty-five or one hundred and sixty-eight months.

THE COURT: What is the defendant's position, on behalf of counsel?

MR. COX: Your Honor, the defense, basically, accepts the government's assessment, level 32 on the money laundering and level 30 on the drugs. There may be some difference of opinion about the criminal history category being IV. I haven't had an opportunity to look and, you know, parse each prior conviction to determine whether they're eligible for consideration for a criminal history point and would properly apply.

So, we accept the statement of the government as to its calculations, but reserve argument on the criminal history category.

THE COURT: Once the presentence investigation report is prepared?

MR. COX: Yes.

THE COURT: Understand, sir, the discussion we've just had on the Guideline range?

THE DEFENDANT: Yes Your Honor.

THE COURT: Do you understand that after your initial advisory Guideline range has been determined, the Court has the authority in some circumstances to depart upward or downward from the range and will also examine other statutory sentencing factors under Title 18, United States Code, Section 3553(a), that may result in the imposition of a sentence that is greater or lesser than the advisory Guideline sentence?

THE DEFENDANT: Yes, Your Honor.

## II.     Standard of Review

Section 2255 of Title 28 of the United States Code provides that:

> (a) A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a).

Further, Section 2255 provides that the Court shall grant a prompt hearing unless Petitioner's Motion to Vacate, and the files and the records in this case "conclusively show that the prisoner is entitled to no relief[.]"  28 U.S.C.  § 2255(b).

When a defendant brings a motion to vacate sentence pursuant to Section 2255, the district court is required to hold an evidentiary hearing on a motion to vacate sentence unless the motion and files and records of the case show conclusively that the movant is not entitled to relief.  *United States v. Lilly*, 536 F.3d 190, 195 (3d Cir. 2008) (emphasis added), citing *United*

*States v. Booth,* 432 F.3d 542, 545 (3d Cir. 2005).  In exercising that discretion, " 'the court must accept the truth of the movant's factual allegations unless they are clearly frivolous on the basis of the existing record.' " *Lilly*, 536 F.3d at 195, quoting *Gov't of the Virgin Islands v. Forte*, 865 F.2d 59, 62 (3d Cir.1989). "The court should view the factual allegations in the light most favorable to the petitioner." *United States v. Smith*, 101 F.Supp.2d 332, 341 (W.D. Pa. 2000), citing *Gov't of the Virgin Islands v. Weatherwax*, 20 F.3d 572, 574 (3d Cir.1994).

Finally, a *pro se* pleading is held to less stringent standards than pleadings drafted by attorneys.  *Estelle v. Gamble*, 429 U.S. 97 (1976); *Haines v. Kerner*, 404 U.S. 519, 520 (1972). Thus, a *pro se* habeas petition should be construed liberally. See *Royce v. Hahn*, 151 F.3d 116, 118 (3d Cir. 1998).

## III.    Lozano's Section 2255 Petition[4]

As noted above, Lozano filed a *pro se* motion to vacate, set aside, or correct a sentence pursuant to 28 U.S.C. § 2255 setting forth seven grounds for *vacatur* or correction.

### A.  Lozano was essentially "lured" into not taking his case to trial, accepting a plea offer, and on the day the sentencing hearing "the offer was changed" resulting in a higher guideline range.

Lozano begins by claiming he was essentially "tricked" or "lured" into taking a "plea offer," instead of  "taking his case to trial,"  and at the sentencing hearing the "offer was changed," so that he received an enhancement which resulted in a higher guideline range.

The Court begins its analysis by noting that there were several conferences held in open Court, with Defendant present, prior to jury section on February 14, 2017, and the start of trial on February 21, 2017.  These have been described above in Section I.B. in great detail.

---

[4] Based on the facts of this case as discussed more thoroughly herein, this Court finds it is not required to hold an evidentiary hearing because the motion and files and records of the case conclusively show that Petitioner is not entitled to relief.

After four status conferences had been held (on August 15, 2016, November 21, 2016, January 4, 2017, February 7, 2017), Lozano and his counsel were still considering taking a plea, but they were simultaneously preparing for trial.  There had been discussions among the Government, Lozano, and Lozano's counsel before this Court (during the various status conferences this Court held in 2016 and 2017), all prior to jury selection in this case, as to whether Lozano would accept the Government's plea offer.  However, during these 2016 conferences, Lozano's counsel made it known to this Court that Lozano was not satisfied with the Government's plea deal offers.  ECF 396.

A jury was chosen on February 14, 2017 and the trial was to begin the following week on February 21, 2017.  However, on February 21, 2017, Lozano took an open plea.  There was <u>no</u> plea agreement executed between Lozano and the Government.  As a result, Lozano could not have been "lured" into "a plea deal," because his guilty plea was made without a plea agreement.

Additionally, on February 21, 2017, during his change of plea hearing, Lozano testified <u>under oath</u> that he was <u>not</u> "forced" to plead guilty, and that he understood the maximum potential sentence which this Court could impose.[5]  See ECF 400.  Moreover, Lozano testified during this hearing that he understood what he was giving up by pleading guilty and he further claimed to have had adequate time to discuss the implications of pleading guilty with his attorney.  Id.  Lozano further indicated that he understood that the guideline range which his counsel and the Government discussed was advisory only.  Id.  Government and Lozano's counsel indicated what their belief was as to the applicable guideline range during the change of plea hearing and placed Lozano at either an offense level of 30 or 32.  Id.  However, the Court cautioned Lozano that the Court would not be able to determine his actual advisory Guideline

---

[5] The Court specifically stated that the potential maximum to which the Court could sentence Lozano at Count one was a minimum of 10 or 20 years to life imprisonment depending if Lozano's Count one offense was his first or second felony drug conviction; and, a mandatory life sentence if it was his third felony drug conviction.

sentence until after the presentence investigation report was prepared and Lozano, his attorney and the Government had an opportunity to challenge the reported facts in the report along with the Probation Officer's calculation and application of the Guidelines. Id.

Because there was no plea agreement in this case, and because this Court found, during the change of plea that Lozano was competent and knowingly understood what he was doing by taking a guilty plea, the Court now finds that his first argument lacks merit and Lozano's Section 2255 Petition will be denied on this ground.

**B. The Court miscalculated the guideline range when it included the four-level enhancement when co-conspirators' interviews, and court proceedings demonstrate that Lozano was not the organizer/leader.**

**C. The United States probation officer erroneously included a four-level enhancement to Lozano's sentencing guideline offense level based solely upon his "belief" and not "facts" that Lozano was an organizer/leader.**

**D. The District Court erred in imposing the four-level enhancement during sentencing, creating a sentence disparity among Lozano and his seven other Co-Defendants.**

**E. Undue bias, prejudice, and influence, and not being within the probation officer's jurisdiction influenced this Court to issue the higher guideline range without evidence to support his claim.**

The Court will analyze these four arguments together, as they all relate to the four-level enhancement Lozano received due to his role as an "organizer" pursuant to United States Sentencing Guideline, § 3B1.1.

This section of the guidelines reads as follows:

> Based on the defendant's role in the offense, increase the offense level as follows:
> (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.
> (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

(c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

U.S.S.G. § 3B1.1.  The commentary to this section specifically states:

> In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.

Commentary (4) to U.S.S.G. § 3B1.1.

Following Lozano's guilty plea on February 21, 2017, the Court ordered that a presentence investigation report be conducted.  ECF 373.  After the report was finalized, Lozano, through his attorney objected to paragraph 15 of that report.  ECF 376.  Paragraph 15 reads as follows:

> 15. The governing guideline for Count 1 is USSG § 2D1.1.   Under this guideline, the base offense level  is  30  based  on  the  drug  amount of  8  kilograms  of  cocaine. USSG§2D1.1(c)(5).  The base offense level is increased by 2 levels, because he made a credible threat  to  use violence,  pursuant  to  §2D1.1(b)(2).   The  offense  level  is  also increased 4 levels for his role in the offense as an organizer/leader, pursuant to §3B1.1(a). The adjusted offense level for this count is 36.

Id.

The Court reviewed Lozano's objection as well as the addendum to the presentence investigation report prepared by the probation officer which stated as follows:

> Based on the facts of the case, it appears that the defendant was an integral leader in the conspiracy and is deserving of the organizer/leadership role enhancement.  He was responsible for establishing a drug distribution and money laundering network in order to carry out the criminal activity.  In order to operate the conspiracy over an extended period of time, he

> used/recruited seven co-conspirators (*i.e.* April Racan, paragraph 7); he had to control his buyers to ensure they paid him; he used threats of violence to make sure they did not talk to law enforcement; and he directed multiple co-conspirators to use various bank accounts to launder the money. In addition, the structuring of the money laundering activities lends credibility to the fact that he was receiving the larger share of the fruits of the crime. For these reasons, the probation officer believes the sentencing guidelines, including the aggravating role enhancement, were appropriately calculated.

ECF 382.

Given the admissions made by Lozano during his change of plea hearing and the statements set forth by his probation officer in the presentence report addendum, this Court issued tentative findings of fact one week before Lozano was sentenced. The Court's tentative findings read, in relevant part, as follows:

> Turning now to the instant matter, the Court begins its analysis by noting, importantly, Defendant's Objection does not object to the facts set forth in paragraphs 4 through 9 of the Presentence Investigation Report. Doc. no. 373. Because Defendant raised no objections to these paragraphs, the Court finds the following as undisputed facts:
>
> 1.  Defendant met Racan in 2006/2007 through George Biscey, a known drug distributor and friend of Turner. Doc. no. 373, ¶ 7.
>
> 2.  After 2006/2007, Defendant made periodic visits to Elizabeth, Pennsylvania, and would stay "months at a time" with Bicsey. Id.
>
> 3.  Defendant was a source of supply for Bicsey. Id.
>
> 4.  After Biscey was arrested and incarcerated in 2011/2012, Defendant called Racan and asked her if she was "interested in making some money[.]" Id.
>
> 5.  Racan and Turner agreed to purchase cocaine from Defendant.
>
> 6.  Turner and Racan paid $1,000.00 per ounce of cocaine and received anywhere from one to seven ounce packages of cocaine through the mail. Id.

7.   On December 23, 2014, a package of cocaine was being shipped to Racan's parent's house but was intercepted by U.S. Postal Inspectors, who proceeded to confront Racan about the package.  Id.

8.   In order to pay for the cocaine, Racan and Turner initially used postal money orders, between March 2012 and August 2012.  Doc. no. 373, ¶ 6.

9.   Postal receipts recovered showed Racan and Turner sent $116,700 worth of money orders.  Id.

10. Defendant instructed Racan and Turner to send the money orders to a Dairy Queen ("DQ") address in Brownsville, Texas, where a DQ manager, Daniel Cosme, would receive them.  Id.

11. Cosme, who was paid to receive the money orders, would turn them over to Defendant. Id.

12. Defendant then paid Hugo Balboa to put the money into various accounts controlled by Defendant.  Id.

13. In August of 2012, Racan and Turner began using cash for the transactions, and it was estimated that as much as twenty-thousand dollars at a time was being sent back to Defendant.  Id.

14. In 2014, after being confronted by DEA agents in Texas about his involvement in cocaine distribution, Defendant called Racan and threatened her and her family if she was "cooperating with the cops." Doc. no. 373, ¶ 8.

These undisputed facts highlight that Defendant recruited Racan and/or Turner to assume Biscey's role (after Biscey was incarcerated) as a dealer/distributor of cocaine within the Commonwealth of Pennsylvania. Defendant also instructed Racan and Turner where to send the money orders which Racan and Turner initially used to purchase the cocaine. Furthermore, Defendant hired Cosme to receive the money orders and cash mailed by Racan and Turner. Defendant also hired Balboa to take the money orders and cash and deposit them into various bank accounts over which Defendant had control.

## II.  TENTATIVE FINDINGS OF FACT

Based upon theses undisputed facts, the Court now tentatively finds as fact the following relevant to Defendant's Objection:

15. The Court finds as fact that Defendant held the primary decision-making authority in this conspiracy.

a. First, Defendant actively sought to replace Biscey after Biscey was incarcerated. To this end, he actively sought out and then recruited Racan (and/or Turner through Racan) as conspirators who would purchase and possess and/or distribute cocaine in the Western District of Pennsylvania.
b. Second, Defendant recruited Cosme and Balboa to launder the money orders and cash he received from Racan and Turner as payment for the shipments of cocaine.

16. The Court finds as fact that Defendant had the highest degree of participation in planning and organizing the conspiracy because he "hired" all of the "key" players – Racan/Turner in Pennsylvania, and Cosme and Balboa in Texas.

17. The Court finds as fact that the nature and scope of these activities was broad and far- reaching in that Defendant caused the cocaine to be shipped in interstate commerce through the United States Postal Office. Defendant also required that the funds/proceeds from the illegal purchase of the cocaine be shipped in interstate commerce through the United States Postal Office to a person/business he designated so as to avoid detection. Defendant, therefore, caused the cocaine to travel an extensive distance (from Texas to Western Pennsylvania) and further caused money orders to be sent an extensive distance (from Western Pennsylvania to Texas) as payment for the cocaine.

18. The Court further finds as fact that Defendant had control and authority over Racan, Turner, Cosme, and Balboa. In addition, when pecuniary gain for the co-conspirators (specifically, Racan and Turner) was waning in light of the DEA investigation, Defendant resorted to threats of violence against Racan and her family in an attempt to ensure obedience to his orders.

19. Finally, as noted by the Probation Office in its Addendum to the Presentence Investigation Report (see doc. no. 382), prepared in response to Defendant's Objection, the Court finds as fact, that Defendant's control and structuring over the money laundering activities is evidence that he was receiving the larger share of the fruits of the drug crime.

III. RULINGS

Based on the above undisputed findings of fact and the tentative findings of fact, the Court tentatively rules that Defendant was an organizer/leader of the two offenses to which he has pled guilty. Because of Defendant's organizer/leadership role, the 4-point enhancement to the offense level as assessed by the Probation Office was both warranted and appropriate.

The Court's tentative ruling necessarily finds that Defendant was an organizer/leader of a cocaine distribution chain which emanated with Defendant in Texas, extended across state lines all the way to the Western District of Pennsylvania, and was a chain that he sought to continue after his Pennsylvania purchaser (Biscey) was incarcerated, which caused Defendant to actively recruit Racan (and/or Turner) to fill Biscey's vacancy. The Court's ruling is also predicated upon the fact that Defendant directed Racan and Turner to pay for the cocaine by using money orders (and later cash), and by requiring Racan and Turner to ship the monies to a Dairy Queen address in Texas which was managed by another one of Defendant's recruits – Cosme. The Court's ruling is also supported by the fact that Defendant had another person in Texas whom he controlled, Balboa, deposit the funds Cosme received into various bank accounts controlled by Defendant to escape personal detection.

All of these facts illustrate that it was Defendant who orchestrated this extensive and intricate plan to move cocaine from Texas to Pennsylvania and receive funds for that cocaine in such a way so as to avoid detection from law enforcement authorities.

Accordingly, the Court will tentatively overrule Defendant's Objection to paragraph 15 of the Presentence Investigation Report and apply the four-point enhancement to Defendant's
offense level.

ECF 386.

During Lozano's sentencing hearing these tentative findings were adopted as final, and thus, this Court overruled Lozano's objection to the four-level enhancement. Simply stated, the evidence was both clear and abundant to this Court that Lozano was a leader, organizer, and manager of the drug distribution as well as the money laundering schemes.

Following the sentencing hearing and the entry of Judgment, Lozano appealed this Court's decision to apply the four-level enhancement to the United States Court of Appeals for the Third Circuit. See *United States v. Lozano,* 745 Fed. Appx. 466 (2018). The Court of Appeals affirmed this Court's decision to apply the enhancement noting:

Although the court must base any Chapter Three enhancement on the money laundering offense, neither the unambiguous text of the relevant Application Note, nor common sense, requires a sentencing court to turn a

blind eye to the underlying conduct in fashioning an appropriate sentence. Here the court concluded that the record established that Lozano was an organizer or leader of both the drug conspiracy and the money laundering conspiracy, and nothing in the applicable Guidelines or the relevant Application Notes prevents the court from reaching that conclusion on this record.

Moreover, the court correctly concluded that the facts underlying Lozano's plea to the money laundering conspiracy alone established that he had "hired all of the key players," that the "nature and scope of the activities was broad and far-reaching," and that Lozano had "control and authority" over members of both the drug conspiracy and the money laundering conspiracy.

*Id.* and ECF 404-1.

Based on the foregoing, the first of the three specific arguments raised by Lozano is without merit. Both this Court and the Court of Appeals have determined that the 4-level enhancement was appropriately applied pursuant to USSG 3B1.1. Lozano's second argument concerns the probation officer's calculation of Lozano's offense level which included the four-point enhancement. This argument is moot as this Court and the Court of Appeals have both determined that the application of the four-level enhancement was appropriate.

Simply put, the evidence which the Government explained included copies of money orders and live witness testimony from at least five of Lozano's co-conspirators (and it is noteworthy that Lozano's counsel was shown copies of the witnesses' reports), provided the requisite proof that Lozano was the leader or organizer of this drug distribution operation.

### F. Lozano's sentence was unreasonable "per the Sixth Amendment based on the preponderance of evidence."

Lozano's presentence investigation report indicates that Lozano, due to his criminal convictions had a subtotal criminal history score of five. However, because Lozano committed the instant offense while on probation in Cameron County, Texas, for unlawful possession of a firearm (at Docket No.: 11-CR-1231-A), two points were added in accordance with USSG

§ 4A1.1(d). This brought Lozano's total criminal history score to a seven, which translates into a criminal history category of IV. *See* USSG Chapter 5, Part A.

Lozano's offense level was calculated with the four-point enhancement. Lozano's base offense level was 32, but two points were added because he was charged and pled guilty to 18 U.S.C. § 1956. As noted above, four points were added to his offense level in accordance with USSG §3B1.1(a), because Lozano was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. Two points were deducted from his offense level due to his acceptance of responsibility through his guilty plea. This left Lozano with a total offense level of 36.

The Sentencing Guideline range for Lozano who had a criminal history of IV and an offense level of 36 was 262-327 months imprisonment. This Court sentenced Lozano to an imprisonment term of 210 months (17.5 years), which is a sentence that was well <u>below</u> the low-end of his guideline range.[6] A below-guideline range sentence cannot be considered unreasonable as to Lozano.

**G. Lozano also claims ineffective assistance of counsel.**

Lozano makes five separate arguments in pursuit of his ineffective assistance of counsel claim. To demonstrate that his counsel was ineffective and thereby render Lozano's guilty plea involuntary, he must show that: (i) his counsel's representation fell below an objective standard of reasonableness demanded of attorneys in criminal cases; and (ii) there is a reasonable probability that, but for counsel's errors, he would have proceeded to trial instead of pleading guilty. *United States v. Nahodil*, 36 F.3d 323, 326 (3d Cir. 1994). In any case presenting an

---

[6] Notably, even if the four-point enhancement had not been applied to Lozano's offense thereby rendering his offense level a 32, Lozano's criminal history score of IV and his offense level of 32 would have given him a guideline range of 168-210 months. Thus, his sentence of 210 months would have been within this alternative guideline range.

ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. *Strickland v. Washington*, 466 U.S. 668, 688 (1984).

Based on the transcript excerpts from the many conferences held <u>before</u> February 21, 2017, Lozano avoided pleading guilty. Based on the discussions at those same conferences the only reason given for Lozano's reluctance to change his plea was because he was not satisfied with what the Government was offering him in exchange for his guilty plea. Therefore, this Court and counsel for Lozano and the Government prepared for a jury trial.

A jury was empaneled one week prior to Lozano's guilty plea and his counsel, along with the Government, were ready to begin with opening statements to the jury on the day Lozano pled guilty. Thus, Lozano, perhaps more than many other defendants, had a jury waiting to hear his case on the very day he pled guilty, and could have just as easily proceeded with his jury trial.

With this standard in mind and given the specific posture of the case on the day Defendant pled guilty, the Court will address each of Lozano's ineffective assistance of counsel claims, seriatim.

First, Lozano argues that his counsel "failed to consult or explain to [Lozano] how the U.S.S.G. commentary note would affect his sentence." However, as the excerpts from the conference transcripts show, the Government's viewpoint of Lozano's role as a leader (*i.e.,* the basis for the potential 4-point enhancement under the Sentencing Guidelines) was referenced in open Court during the November 21, 2016 conference. ECF 396. Therefore, even if his attorney had failed to privately tell Lozano that he was being considered a leader, Lozano's attorney made it known to Lozano in open court on November 21, 2016 that the Government considered him to be the leader. Thus, this Court finds that Lozano had very early notice that he was being

considered by the Government as a leader.  In addition, as the Government explained in open

court, Lozano could <u>not</u> receive less time than his co-conspirators to whom he supplied cocaine.

Finally, Lozano's counsel represented in open court that he had provided Lozano with all of the

information as it was given to him by the Government; thus, this Court finds that Lozano's

representation fell well within an objective standard of reasonableness demanded of attorneys in

criminal cases.

Second, Lozano argues his counsel was ineffective "for not raising the unwarranted

disparity under 18 U.S.C. 3553(a)(6) where [Lozano's] codefendant received under 48 months as

compared to [Lozano] receiving 210 months imprisonment."  Although it is true that co-

defendant, Joe Borelli, received a term of imprisonment of 48 months, the following highlights

the differences between Borelli and Lozano:

- Borelli was only charged with, and pled guilty to, Count one (the drug conspiracy count) and not Count two (the money laundering count) – Lozano was charged with, and pled guilty to both counts;

- Borelli's total offense level was 29 – Lozano's total offense level was 36;

- Borelli's total criminal history score was 3, and pursuant to the sentencing table in USSG Chapter 5, Part A, a criminal history score of 3 establishes a criminal history category of II – Lozano was a IV;

- Borelli's guideline range was 97-121 months imprisonment – Lozano's was 262-327 month imprisonment;

- Borelli received nearly a 50% reduction from the low end of his guideline range sentence; Lozano received 20%;

- Borelli was not the organizer of the conspiracy refenced in Count one, but Lozano was, in fact, the leader and organizer of the conspiracy; and

- Borelli (and other co-defendants) were willing to serve as witnesses against Lozano during Lozano's trial, which the Government stated in open Court during a conference.

Given these significant disparities and the Court's own familiarity with the roles of each of the co-defendants and their respective sentences, Lozano's counsel's representation did not fall below an objective standard of reasonableness demanded of him in this criminal case.

Third, Lozano argues that his attorney was ineffective for not investigating "all possible consequences, file any pre-trial motions, and read the commentary [to] note 2(c.) and advise [Lozano], and not to make any uninformed promises about [Lozano's] sentence." As this Court noted above, Lozano's counsel was on the verge of providing his opening statement to an empaneled jury when Lozano decided to take an open guilty plea, without a plea agreement. Additionally, as the transcript excerpts above illustrate, Lozano's counsel questioned evidence when the government first shared it with him. For example, Lozano's attorney stated that when Lozano was interviewed, he made no inculpatory remarks and the other evidence only referred to a person by the name of "D," which, Lozano's attorney argued could be anyone, not just Dante Lozano. Lozano's counsel also contended that there was no evidence as to how or exactly when Lozano came to Pennsylvania from Texas. Thus, this Court finds that counsel conducted a thorough investigation and his actions did not fall below the standard of objective reasonableness in this regard. More importantly, Lozano affirmed for this Court while he was under oath during his change of plea hearing on February 21, 2017, that he was satisfied with the advice and representation his attorney had given him, and that no one had made any promises as to what his

actual sentence would be.  Therefore, this Court finds this claim for ineffective assistance of counsel to be meritless.

Fourth, Lozano claims that he was not advised by his attorney that he would be unable to challenge the "unreasonableness" of his sentence under 3553 (a)(6) by changing his plea.  By referencing 18 U.S.C. § 3553(a)(6), Lozano appears to be suggesting that this Court failed to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.  To the contrary, Defendant received a below the guidelines sentence for the crimes to which he pled guilty and thus, like others who fall into the criminal history level of IV, and possess an offense conduct score of 36, Defendant was treated more favorably than others with his criminal history and offense level scores.  Furthermore, the Court explained during the change of plea colloquy that Lozano had the right to appeal any sentence the Court imposed, unless he were to voluntarily give up that right.  Following his open guilty plea, the Court took a recess to allow Lozano and the Government one final attempt to reach a plea agreement.  An agreement did not come to fruition, and thus, Lozano never gave up any of his rights to appeal.  Thus, the Court finds this argument moot.

Fifth, Lozano claims that his attorney "was ineffective in providing assistance by not filing pre-trial motions or any of the motions [Lozano asked] to be done.  In addition, the Counsel provided an address that was not in use and this obstructed [Lozano's] access to the counsel."  As the excerpted transcripts illustrate, there was a period of time where communication difficulties existed between Lozano and his attorney.  However, those same transcripts also illustrate the number of times this Court asked Lozano if he was satisfied with the communication between him and his attorney.  He repeatedly affirmed that all was well.  Moreover, during his change of plea hearing there was an specific exchange wherein this Court

asked Lozano, while he was under oath, if he had adequate time to talk over the change of plea with his attorney, to which Lozano responded "yes." The Court also asked Lozano at the sentencing hearing, while Lozano was under oath, if he was completely satisfied with the advice and representation his attorney had given him, and again, he responded, "yes." Although it appears that Lozano wanted his attorney to file certain pre-trial motions at Lozano's direction and directive, his attorney was under no obligation to do so. This Court finds that throughout the many conferences held in open court and the many written submissions to this Court, Lozano's attorney's counsel and representation in this case never fell below the standard of objective reasonableness. Accordingly, Lozano's ineffective assistance of counsel argument shall be denied.

**IV.     Conclusion**

Based on all the foregoing reason, each of Lozano's arguments fail to support his Section 2255 Petition, and thus his Petition will be denied by way of a separate Order filed contemporaneously with this Opinion.

<u>s/ Arthur J. Schwab</u>
Arthur J. Schwab
United States District Judge

cc:     All counsel of record
                 and
        Dante Lozano - 37915-068
        FCI Bastrop
        Federal Correction Institution
        PO Box 1010
        Bastrop, TX 78602